IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CHARLES MEYERS, | ) |
| | ) |
| Plaintiff, | )  3:19-cv-00512 |
| | ) |
| v. | ) |
| | ) |
| TRANS UNION, LLC, | ) |
| EXPERIAN INFORMATION | ) |
| SOLUTIONS, INC., and | ) |
| EQUIFAX INFORMATION | ) |
| SERVICES LLC, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

NOW COMES the Plaintiff, CHARLES MEYERS, by and through his attorneys, SMITHMARCO, P.C., and for his complaint against Defendants, TRANS UNION, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., and EQUIFAX INFORMATION SERVICES LLC, Plaintiff states as follows:

### I.  PRELIMINARY STATEMENT

1. This is an action for actual and statutory damages for violations of the Fair Credit Reporting Act (hereinafter "FCRA"), 15 U.S.C. §1681, et. seq.

### II.  JURISDICTION & VENUE

2. Jurisdiction arises under the Fair Credit Reporting Act 15 U.S.C. §1681, et. seq., and pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1337.

3. Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

## III. PARTIES

4. CHARLES MEYERS, (hereinafter, "Plaintiff") is an individual who was at all relevant times residing in the City of Elkhart, County of Elkhart, State of Indiana.

5. At all relevant times, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. §1692(a)(3) and 15 U.S.C. §1681a(c).

6. TRANS UNION, LLC, (hereinafter, "Trans Union"), is a business entity that regularly conducts business throughout every state and county in the United States and as a corporation that does business in the state of Indiana, is a citizen of the state of Indiana.

7. At all relevant times Trans Union was a "person" as that term is defined by 15 U.S.C. §1681a(b).

8. At all relevant times Trans Union was a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).c

9. EXPERIAN INFORMATION SOLUTIONS, INC., (hereinafter, "Experian"), is a business entity that regularly conducts business throughout every state and county in the United States and as a corporation that does business in the state of Indiana, is a citizen of the state of Indiana.

10. At all relevant times Experian was a "person" as that term is defined by 15 U.S.C. §1681a(b).

11. At all relevant times Experian was a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).

12. EQUIFAX INFORMATION SERVICES LLC, (hereinafter, "Equifax"), is a business entity that regularly conducts business throughout every state and county in the United

States and as a corporation that does business in the state of Indiana, is a citizen of the state of Indiana.

13. At all relevant times Equifax was a "person" as that term is defined by 15 U.S.C. §1681a(b).

14. At all relevant times Equifax was a "consumer reporting agency" as that term is defined by 15 U.S.C. §1681a(f).

### IV.    FACTUAL ALLEGATIONS

15. Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and Defendants also sell credit scores.

16. Pursuant to the FCRA, Defendants must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

17. Pursuant to the FCRA, Defendants must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.

18. Defendants place a "deceased" notation or marking on reports when they are advised from any of their many data furnishing sources that a given consumer is deceased.

19. The furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

20. Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

21. Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

22. Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

23. A deceased notation is a very unusual marking upon a credit file or credit report.

24. In some cases, in order to assure accuracy, Defendants send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their consumer credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws. But Defendants have no similar procedure to notify the consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendants to be placed in said consumer's credit file or report.

25. Defendants regularly receive the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

26. Defendants will only use the Death Master File to sell additional products for an additional fee which are designed to show whether a given consumer is truly deceased.

27. Indeed, Defendants employ no procedures *at all* which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

28. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

29. Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants employ no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

30. Once a "deceased" mark is placed upon a consumer's report, Defendants will not calculate and will not provide a credit score for that consumer.

31. Nevertheless, Defendants routinely sell to third parties credit reports for persons with a "deceased" mark on their reports with no credit score, despite a request by the purchaser of the report for a credit score for that consumer.

32. Upon Defendants' reports with a "deceased" mark sold to third parties Defendants do not calculate or provide a credit score for that consumer.

33. Defendants know that third party credit issuers use a credit score in order to process a given credit application.

34. Defendants know that many third party credit issuers require a credit score in order to process a given credit application.

35. Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

36. Defendants know that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

37. Defendants have been put on notice for years through consumer disputes and lawsuits that living consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

38. Defendants have received and documented thousands of disputes from consumers complaining that their credit report had them erroneously marked as "deceased."

39. Defendants know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, but said consumers are not on the Death Master File and are, in fact, alive.

40. Nevertheless, Defendants employ no procedures which assure that a consumer marked as "deceased" on one of Defendants' reports is, in fact, deceased.

41. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

42. Defendants have no independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, which reinvestigation was triggered by a consumer dispute.

43. Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers which they have marked as "deceased" under any circumstances.

44. For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

45. Defendants will only remove a deceased consumer's file from their credit reporting database when they are no longer valuable to Defendants – meaning that nobody is continuing to buy those reports from the Defendants.

46. Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

47. Defendants profit from the sale of reports on the deceased.

48. Defendants have in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

49. Defendants know that truly deceased consumers do not apply for credit.

50. Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud.  Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants to be a common and major source of identity theft.

51. Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

52. Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

53. Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

54. Indeed, Defendants sell reports on the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

55. For consumers who are deceased, there exists no permissible purpose under the FCRA for Defendants to ever sell their credit reports, absent a court order.

56. Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

## COUNT I: CHARLES MEYERS v. TRANS UNION, LLC

57. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

58. At all relevant times, credit reports as alleged in this pleading are "consumer reports" as that term is defined by 15 U.S.C. §1681a(d).

59. Trans Union has been reporting derogatory and inaccurate statements and information relating to Plaintiff and Plaintiff's credit history to third parties (hereinafter the "inaccurate information").

60. The inaccurate information of which Plaintiff complains is at least one account, or trade-line, for which the furnisher reporting such information has reported that Plaintiff is

deceased. Upon information and belief, Frontier Communications is one such furnisher that has reported to Trans Union that Plaintiff is deceased.

61. Plaintiff is alive and well.

62. Plaintiff is not deceased.

63. Despite the foregoing, Trans Union has disseminated credit reports and/or information that Plaintiff is deceased.

64. Not surprisingly, the fact that Trans Union is reporting Plaintiff as deceased has impeded Plaintiff's ability to obtain new credit.

65. The inaccurate information negatively reflects upon Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor and Plaintiff's credit worthiness.

66. Credit reports have been and continue to be disseminated to various persons and credit grantors, both known and unknown.

67. Plaintiff has been damaged, and continues to be damaged, in the following ways:

   a. Denial of attempts to obtain financing;

   b. Emotional distress and mental anguish associated with having incorrect derogatory personal information transmitted about Plaintiff to other people both known and unknown;

   c. Decreased credit score which may result in inability to obtain credit on future attempts.

68. Plaintiff's credit report and file have been obtained from Trans Union and have been reviewed by prospective credit grantors and extenders of credit, and the inaccurate information (i.e., that Plaintiff is ostensibly deceased) has been a substantial factor in precluding Plaintiff from receiving different credit offers and opportunities, known and unknown, and from

receiving the most favorable terms in financing and interest rates for credit offers that were ultimately made.

69. As a result of Trans Union's conduct, Plaintiff has suffered actual damages in the forms of lost credit opportunities, harm to credit reputation and credit score, and emotional distress.

70. At all times pertinent hereto, Trans Union was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Trans Union.

71. At all times pertinent hereto, the conduct of Trans Union, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal and state laws and the rights of Plaintiff herein.

72. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Trans Union is liable to Plaintiff for engaging in the following conduct:

> a. willfully and negligently failing to employ and follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit report, information and file, in violation of 15 U.S.C. §1681e(b).

73. The conduct of Trans Union was a direct and proximate cause, as well as a substantial factor, in bringing about the injuries, damages and harm to Plaintiff that are outlined more fully above and, as a result, Trans Union is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

WHEREFORE, Plaintiff, CHARLES MEYERS, by and through his attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and against TRANS UNION, LLC as follows:

> a. All actual compensatory damages suffered;
>
> b. Statutory damages of $1,000.00;

      c.      Punitive damages;

      d.      Plaintiff's attorneys' fees and costs; and,

      e.      Any other relief deemed appropriate by this Honorable Court.

**COUNT II: CHARLES MEYERS v. EXPERIAN INFORMATION SOLUTIONS, INC.**

74.      Plaintiff re-alleges and incorporates by reference paragraphs 1-56 of this complaint as though fully set forth herein.

75.      At all relevant times, credit reports as alleged in this pleading are "consumer reports" as that term is defined by 15 U.S.C. §1681a(d).

76.      Experian has been reporting derogatory and inaccurate statements and information relating to Plaintiff and Plaintiff's credit history to third parties (hereinafter the "inaccurate information").

77.      The inaccurate information of which Plaintiff complains is at least one account, or trade-line, for which the furnisher reporting such information has reported that Plaintiff is deceased. Upon information and belief, Frontier Communications is one such furnisher that has reported to E that Plaintiff is deceased.

78.      Plaintiff is alive and well.

79.      Plaintiff is not deceased.

80.      Despite the foregoing, Experian has disseminated credit reports and/or information that Plaintiff is deceased.

81.      Not surprisingly, the fact that Experian is reporting Plaintiff as deceased has impeded Plaintiff's ability to obtain new credit.

82.      The inaccurate information negatively reflects upon Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor and Plaintiff's credit worthiness.

83. Credit reports have been and continue to be disseminated to various persons and credit grantors, both known and unknown.

84. Plaintiff has been damaged, and continues to be damaged, in the following ways:

   a. Denial of attempts to obtain financing;

   b. Emotional distress and mental anguish associated with having incorrect derogatory personal information transmitted about Plaintiff to other people both known and unknown;

   c. Decreased credit score which may result in inability to obtain credit on future attempts.

85. Plaintiff's credit report and file have been obtained from Experian and have been reviewed by prospective credit grantors and extenders of credit, and the inaccurate information (i.e., that Plaintiff is ostensibly deceased) has been a substantial factor in precluding Plaintiff from receiving different credit offers and opportunities, known and unknown, and from receiving the most favorable terms in financing and interest rates for credit offers that were ultimately made.

86. As a result of Experian's conduct, Plaintiff has suffered actual damages in the forms of lost credit opportunities, harm to credit reputation and credit score, and emotional distress.

87. At all times pertinent hereto, Experian was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Experian.

88. At all times pertinent hereto, the conduct of Experian, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal and state laws and the rights of Plaintiff herein.

89. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Experian is liable to Plaintiff for engaging in the following conduct:

      b. willfully and negligently failing to employ and follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit report, information and file, in violation of 15 U.S.C. §1681e(b).

90. The conduct of Experian was a direct and proximate cause, as well as a substantial factor, in bringing about the injuries, damages and harm to Plaintiff that are outlined more fully above and, as a result, Experian is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

WHEREFORE, Plaintiff, CHARLES MEYERS, by and through his attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and against EXPERIAN INFORMATION SOLUTIONS, INC. as follows:

    a. All actual compensatory damages suffered;

    b. Statutory damages of $1,000.00;

    c. Punitive damages;

    d. Plaintiff's attorneys' fees and costs; and,

    e. Any other relief deemed appropriate by this Honorable Court.

### COUNT III: CHARLES MEYERS v. EQUIFAX INFORMATION SERVICES LLC

91. Plaintiff re-alleges and incorporates by reference paragraphs 1-56 of this complaint as though fully set forth herein.

92. At all relevant times, credit reports as alleged in this pleading are "consumer reports" as that term is defined by 15 U.S.C. §1681a(d).

93. Equifax has been reporting derogatory and inaccurate statements and information relating to Plaintiff and Plaintiff's credit history to third parties (hereinafter the "inaccurate information").

94. The inaccurate information of which Plaintiff complains is at least one account, or trade-line, for which the furnisher reporting such information has reported that Plaintiff is deceased. Upon information and belief, Frontier Communications is one such furnisher that has reported to E that Plaintiff is deceased.

95. Plaintiff is alive and well.

96. Plaintiff is not deceased.

97. Despite the foregoing, Equifax has disseminated credit reports and/or information that Plaintiff is deceased.

98. Not surprisingly, the fact that Equifax is reporting Plaintiff as deceased has impeded Plaintiff's ability to obtain new credit.

99. The inaccurate information negatively reflects upon Plaintiff, Plaintiff's credit repayment history, Plaintiff's financial responsibility as a debtor and Plaintiff's credit worthiness.

100. Credit reports have been and continue to be disseminated to various persons and credit grantors, both known and unknown.

101. Plaintiff has been damaged, and continues to be damaged, in the following ways:

   a. Denial of attempts to obtain financing;

   b. Emotional distress and mental anguish associated with having incorrect derogatory personal information transmitted about Plaintiff to other people both known and unknown;

   c. Decreased credit score which may result in inability to obtain credit on future attempts.

102. Plaintiff's credit report and file have been obtained from Equifax and have been reviewed by prospective credit grantors and extenders of credit, and the inaccurate information (i.e., that Plaintiff is ostensibly deceased) has been a substantial factor in precluding Plaintiff from

receiving different credit offers and opportunities, known and unknown, and from receiving the most favorable terms in financing and interest rates for credit offers that were ultimately made.

103. As a result of Equifax's conduct, Plaintiff has suffered actual damages in the forms of lost credit opportunities, harm to credit reputation and credit score, and emotional distress.

104. At all times pertinent hereto, Equifax was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax.

105. At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants and/or employees, was malicious, intentional, willful, reckless, and in grossly negligent disregard for federal and state laws and the rights of Plaintiff herein.

106. Pursuant to 15 U.S.C. §1681n and 15 U.S.C. §1681o, Equifax is liable to Plaintiff for engaging in the following conduct:

    c. willfully and negligently failing to employ and follow reasonable procedures to assure maximum possible accuracy of Plaintiff's credit report, information and file, in violation of 15 U.S.C. §1681e(b).

107. The conduct of Equifax was a direct and proximate cause, as well as a substantial factor, in bringing about the injuries, damages and harm to Plaintiff that are outlined more fully above and, as a result, Equifax is liable to Plaintiff for the full amount of statutory, actual and punitive damages, along with the attorneys' fees and the costs of litigation, as well as such further relief, as may be permitted by law.

WHEREFORE, Plaintiff, CHARLES MEYERS, by and through his attorneys, respectfully prays for Judgment to be entered in favor of Plaintiff and against EQUIFAX INFORMATION SERVICES LLC as follows:

    a. All actual compensatory damages suffered;

      b.      Statutory damages of $1,000.00;

      c.      Punitive damages;

      d.      Plaintiff's attorneys' fees and costs; and,

      e.      Any other relief deemed appropriate by this Honorable Court.

## V. JURY DEMAND

108. Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
**CHARLES MEYERS**

By:   s/ David M. Marco
      Attorney for Plaintiff

Dated: July 3, 2019

David M. Marco
IL Bar No. 6273315/FL Bar No. 125266
SMITHMARCO, P.C.
55 W. Monroe Street, Suite 1200
Chicago, IL 60603
Telephone:   (312) 546-6539
Facsimile:    (888) 418-1277
E-Mail:       dmarco@smithmarco.com